Thank you, Your Honor. May it please the Court, I'm Mark Fuller. I'm here today to argue on behalf of all of the appellants. I'm going to try to reserve two minutes for rebuttal, if I could. This appeal turns on two essential points. One, this is a class action seeking damages under Rule 23b-3. And two, the plaintiffs have put forward a single damage theory to measure damages on a class-wide basis. And that damage method or model is the difference between a, rates approved as just and reasonable by the Arizona Corporation Commission in 2010, and b, rates and a tax policy, tax pass-through policy, approved as just and reasonable in 2011 and 2013, which also produced just and reasonable rates for Johnson Utilities. And in the case of the tax pass-through policy, it resulted in just and reasonable rates for all other similarly situated utilities. And I mentioned just and reasonable a couple of times already because it goes uncontested in this case. The plaintiffs have accepted, for purposes of this Court's review, as they did below, that the rates set in 2011 and 2013 were, in fact, just and reasonable as a matter of law. And so Comcast teaches that a district court cannot properly certify a Rule 23b-3 damages class action unless the plaintiff has come forward with a legally valid method or model to calculate damages on a class-wide basis, a model that fits with and is accepted by the law as a way to recover class-wide damages for the injury being claimed. Time and again, both this Court and other courts have characterized this, have given it a shorthand as, quote, the valid method, end quote, test. That's what the plaintiffs need to propose. And, in fact, that's what the plaintiffs themselves described as the correct legal test in their motion for class certification, which is that— Counsel, but does Comcast actually use the word the legally valid method? I don't think it uses those words. It does not. That's the shorthand that has been the summary, if you will, that's been used by this Court. On the other hand, what Comcast does say is that the fact—it is not permissible that there is simply, and I'm going to quote, any method of measurement being acceptable so long as it can be applied class-wide. It rejects that notion on the idea that that would reduce predominance to a nullity and holds that if the plaintiffs haven't proposed a valid model, and in that case, it was a valid model or method to calculate on a class-wide basis the particular kind of antitrust injury for which the plaintiffs were seeking compensation, then, quote, questions of individual damage calculations will inevitably overwhelm common issues. And what that would mean in this case is 38,000 different rate payers, not—you can't use the model. If the plaintiffs haven't proposed a legally valid model, then that model can't be used to measure those damages, and we have 38,000 individualized causation and damages analyses. But, Counsel, you would concede in Comcast that they didn't analyze the legality of the damages, the theory of damages. The problem in Comcast was the theory of damages didn't match the theory of liability, and that's what I think the Court was saying was invalid, not that you look at defenses to the damages to assess whether or not it predominates. Your Honor, I think there's a nuance there. One, the Court looks carefully, applies the rigorous analysis, and finds that the damage model that was put forth by the plaintiffs with an expert, which claimed to calculate class-wide damages down to the very dollar, was inadequate because it overstated the damages that could be recovered for the particular antitrust injury. Now, the reason why a method is invalid is not the question. Comcast provides the guidance to the lower courts, and I would offer up the Gwian case from this Court, 2019, as an excellent illustration of the proper analysis. Gwian was a case in class action reviewed under 23F on interlocutory appeal where the plaintiffs sought damages for violation of various consumer warranty statutes and proposed a single damage theory of benefit of the bargain theory. And there were arguments about why that was or wasn't a legally valid model. And so what this Court did was it said, step number one, the first thing we need to look at is look at these causes of action and see whether or not this is a valid damage method to produce class-wide calculations of damages in this case. And so the Court looked at the particular statutes that were in question and looked to the interpretive case law under those statutes and held that, yes, for these particular claims, you can recover damages on a benefit of the bargain basis. And that's the analysis, the rigorous analysis, that Comcast teaches needs to be applied. It's not a matter of defense either. The filed-rape doctrine is hand-in-hand with the filed-rape doctrine. And we see this in the RICO cases we've cited and which this Court has cited with approval. It goes hand-in-hand with RICO injury. Injury to business or property under RICO is the same as injury to business or property under the antitrust statutes. In fact, that's borrowed from the antitrust statutes. I think the Taffet case has an excellent discussion of that. But it wasn't considered whether or not you have established a model for the injury you're claiming. The injury being claimed here, at least under the federal law, is a RICO injury. But the law says that injury cannot be measured on this basis. It's not a defense. It is whether you have established a damage model that can be used for a damages class action. And that's the kind of analysis that Comcast says and Gwian and so forth says is the proper analysis. And it's not a matter of calculating damages based on a valid model. It's a matter of looking at the model itself. It's step number one, as this Court said, in Gwian. I'm sorry. I'm slightly confused. So the filed-rate doctrine you're asserting is not a defense. It's actually part of the elements of damage? I'm lost on it. If it's not a defense, what is it? Well, at the 23—I'm sorry. At the class certification stage, it is the plaintiff's birth, and not on a pleading standard and not with deference, but must prove after a rigorous analysis that they have offered a damage theory that can measure damages on a class-wide basis. That's their burden. If it could be characterized as a defense in an individual action, perhaps. But in a class basis, you look at this at the class certification stage, and it fails the predominance test inevitably, to use the Supreme Court's analysis, the Supreme Court's own language. And we've briefed the filed-rate doctrine. It's not a nuanced area of the law under this Court's teaching and circuits around the country. Every kind of case—fraud cases, bribery cases, and so forth. We've also briefed the Arizona law. Yes, sir. Could I interrupt you for a second? Early on you said that the appellee agrees that the 2011 and 2013 rates were fair and reasonable. Is that—did I get you right on that? I think, Your Honor, I used the word accepts rather than agrees. Because the plaintiffs—and it's in the answering brief as well—they say they are not arguing. For purposes of this case, they are not arguing that the rates set were anything other than—and the phrase actually in the Arizona Constitution is just and reasonable as opposed to fair. I'm not sure there's a big distinction there. But in any event, they are not claiming that under Arizona law they were unjust or unreasonable. To the contrary, they accept that. Now, do they say we agree with it? No. They say we accept it. We don't challenge it. Is that a—I think that's a distinction without a difference. Well, I think it's very important here because if the rate payers are obligated to pay rates that are either fair or reasonable or just and reasonable, and the 2010 rates are without any question fair and reasonable or just and reasonable, and the 2011 and 2013 rates are both fair and just and reasonable, then there's no damage. Right. Did I hear you correctly? You said then there's no damage. It would seem to me that if the obligation of the rate payers is to pay fair and reasonable rates, regardless of how those rates were arrived at, whether they arrived at by science, by fact, or by bribery, they've been found to be fair and reasonable. That's absolutely correct, Your Honor. I mean you've just summarized our argument. So your position is that there's no cognizable injury because the plaintiffs have pleaded themselves on to the case. Absolutely, and that's the corollary. And as I was trying to indicate in response to Judge Blumenthal, the cases on filed rate make that same point. The RICO cases and the antitrust cases, applying the filed rate doctrine, also the corollary, and they also apply this same principle. I'll be interested to hear from Mr. Crislaw whether he agrees with you that the appellee has either accepted or stipulated that the 2011 and 2013 rates were not affected at all by bribery and were indeed fair and just and reasonable. If I understood you, you'll wait and pose that question to him. I will say, and I will perhaps in rebuttal have an opportunity to comment on that. I think I can find the place in the answering brief and in the pleadings below where, and in fact the district court commented on that in the class certification order, said they're not challenging. The plaintiffs are not challenging that the rates were just and reasonable. District court said that. The plaintiffs said that. I believe it's in the answering brief, and we can find the page for that. I have very little time remaining, and I want to rebut just very quickly this idea that the plaintiffs aren't asking this court to wade into the rate making process by just looking at the actual record, the chronology of events in this case. Because in 2011, there, well, two things. First, there was a four-to-one vote to reopen and to reconsider the 2010 rates, which the commission had already invited Johnson Utilities to do. There had been a change in the commissioner in 2010, and throughout this time period, we have a decade, there's constant change in the makeup of the commission. And in 2011, what Johnson Utilities proposes is a whole bundle of different adjustments, eight of them, I think. The commission has its, go ahead. You didn't appeal any of those issues. You only appealed the 23F. You didn't appeal the, you didn't seek an interlocutory appeal of the district court determination that the filed rate doctrine was an affirmative defense. And you didn't seek an appeal in the ACC ruling that the Arizona State Court could determine the plaintiff's tort and contract claims as decided in the Monday case. So all your argument here is that the certification was wrong because there's no damage theory which overweighs the individual ones. So if, indeed, there is no damage possible because all the rates were fair and reasonable, that's the problem I have. Yes, in your honor, I know I'm already under my two minutes. I could respond on the Monday case quickly, but I don't, it's up to the court. Go ahead. All right. On the Monday case, what the commission held, actually, what the commission did was it kept the rescission claim. It said you can proceed on rescission of our orders regarding rates. You can intervene. You can make your case to us if you wish. And that's not to us. That's to the plaintiffs in the Monday case. The plaintiffs chose to abandon that, dismiss that claim. At the same time, the commission also said that if you were going to assert civil damage claims, we don't have exclusive jurisdiction over that. We understand you need to go to the courts. That doesn't mean that the claims are any good or that you have compensable damages or that you articulated a theory of damages. It's just that you don't file a civil RICO case, for example, in the ACC. You challenge rates. The ACC always, always has jurisdiction and, indeed, exclusive jurisdiction to set just and reasonable rates to alter or amend or rescind any of its prior decisions. And the plaintiffs in the Monday case could have done that, and they abandoned that and dismissed that claim. Do you want to reserve the rest of your time? I will give you your two minutes back. Yes, please. Thank you, Your Honor. Okay. Mr. Crisloff? There we go. Thank you, Your Honor. What I would like to – the judge raised his decision very carefully, both on the motion to dismiss and on the class certification issue, which is before us. Went very carefully through, identified the criteria, the 23A that were met, and as well identified that it fit comfortably within 23B3. This is really just a challenge to his ruling denying their motion to dismiss. And the answer is, regardless of what my friend on the other side has said, there is no free-flowing filed-rate doctrine that just applies everywhere. It is the regulator's sovereign whose law governs on this issue in Arizona, as everybody recognizes, has not adopted the filed-rate doctrine. So it doesn't apply. And the federal courts, this one, this circuit in particular, and the Seventh Circuit in Gunn, make it very clear that it is not the federal court's place to impose the filed-rate doctrine on a state which has not adopted it. Mr. Crisloff, can I ask you a question? I think I know what's coming, but go ahead. Number one, do you stipulate and agree that the rates arrived at in 2011 and 2013 were fair and reasonable? No. No. Okay. The issue is not whether those amounts were fair and reasonable, although, for example, if you took the tax pass-through, the federal courts, and I believe the District of Columbia Circuit held that such a pass-through was conceptually inappropriate. Nonetheless, the issue is whether you can bribe your way to a rate and keep the rate without regard to anything else. And, you know, could somebody take the regulator's children hostage and enforce that rate? The fact is that where somebody has done what they've done, that corrupts the system, not just submits bogus or flawed documents, but where they have corrupted the system, can they really, they waive the right to use that as defense. May I ask you the next question? Do you agree that the only Arizona institution or jurisdiction that can determine what rates are fair and reasonable is indeed the ACC? The ACC is charged with setting a rate. Arizona has made it clear that where there are defects in the rates application, where there are defects, that the courts have a role, especially whereas here there was a civil wrong, like a tort, like bribery. Give me a straight answer, Mr. Criswell. Sorry. I'll say it again. Is the ACC the only state law institution that can determine what rates are fair and reasonable? Its determination is not exclusive under Arizona law. It does indeed set a rate. And that is true. But where the rate has been set by the means of, in this case, bribery, which corrupts the system, isn't just that the particular documents which were submitted might be overstated, understated, or that nobody reviewed it. Where they have done it by bribery, or where they, in the area. Isn't your avenue of relief or redress to go to the ACC and prove that the rate was done by bribery and have the rate rescinded and have refunds made to the rate payers? They don't have that. They don't have that authority. How do you know that? In the Monday case, they brought precisely those claims before the ACC. And the ACC, in the Monday case, said that's not ours to do. They don't. The ACC does not go back and retrospectively change the rates in the past to even if they were the result of bribe. Do you think the District Court in Arizona can determine on its own and on the evidence presented to it what the just and reasonable rates would have been had there not been bribery? Need not do it in this case because the 2010 rates were fine. There was no problem with those. And the only thing that happened was that although Mr. Johnson's efforts to get the rates changed in the meantime were unsuccessful until Johnson Utility and Johnson bribed the regulators to get the 2011 increase. The 2011 increase is the measure of damages for the wrong. Is it your position that nothing but the bribery could have caused the true 2011 and 2013 rates to change from the 2010 rates? Probably so, yes. What about the price of electricity, the price of labor, inflation in the economy, all those other things which sometimes affect utility rates? Sometimes they do, but this wasn't that case. How do you know that? Because his efforts to get the rates changed after the 2010 rates were unsuccessful as laid out in the District Judge's opinion until as a result of the bribery, both the funneling the money and the property. This is a unique case where it's not merely generalized allegations. The federal indictment is very particular as to how the bribery had occurred and what had been the result. And the fact is we're pursuing the bribery, the wrong, and indeed the measure of the bribery. Can I ask this? So is your theory of liability that there is a range of rates that can be reasonable and just? And in 2010, there was one reasonable rate. In 2011, there was another reasonable rate that was inflated then from 2010, but the only reason for that 2011 rate was because of the bribery. And so therefore, then there's ill-begotten gains or at least an injury to your class members. Is that right? And so it doesn't really matter whether or not the two different rates are reasonable. It's just that there was an injury because of the increase in rates. We don't concede that the 2011 rate was reasonable. We're just saying that regardless of that beside the point, if you bribe to get the rate, the new rate, you don't get the benefit of that. Or you could say that's the measure of the damages from the bribe. And indeed, one of the questions that that you all have focused on is calculating the damages. And Comcast is a whole different case. Comcast says that where you have engaged in any trust efforts on the cable market, you have to figure out which neighborhoods were clustered with which others and how the damages would would be calculated. This is a whole different thing. This is that the layer of the bills, the two layers in the bills that were put in by the 2011 rate increase. Question. Even if the 2011 rate was reasonable. Sorry, I'm getting a feedback. Would you say that that's a defense anyway to to the theory of liability or the theory of damages? Not necessarily that it erases the damages, not that it precludes you from asserting that as a as a as a damage. That if there was a finding that it was reasonable, that that would that would mean that there was no damage from the bribe. Right. Is that a defense or is that something we assess on the on the class certification stage? At the class certification stage, you need only have a an articulate quantification of damages. In this case, it's very easy to do that. They want to say, well, it was reasonable anyway. And the fact is, structurally, the tax pass through has been rejected on a structural basis, not quantity, not quantification. It's just it was rejected dealing with a bunch of other non taxed entities that you don't get to put the tax in into your rate. If for a tax paying company, you get your rate and you don't get your taxes paid out as a as an add on to that. So structurally, it seems hard to envision that they will be able to defend the reasonability. But whatever you cannot. And there's a difference between the cases that say where there hasn't been a review or where the review has been inept or where there has to be some other. Sorry. Different from those. That's why the Alleman case does lend itself here, because where you corrupt the system to get your rate through. Cannot get the benefit of that right. It seems like then we don't do this type of merits analysis just to determine whether or not damages are assessable. Right. This is just that everything you're talking about does not seem that it's appropriate at the classification stage. That seems like a merits question. It is. It is a merits question. And on that, Judge Reyes was very careful and he identified that the filed rate doctrine didn't preclude this at all. And in fact, this is a different case from those that might theoretically require a reasonableness test because the 2010 rates were permanent rates. They were fine. The 2011 increase obtained by bribery. Have that have that tag on it, and they should not get the benefit of that, as I said before. And where is the point at which you punish the bribe or you you recover for the bribe? First of all, if there was a rate beyond fair and reasonable that was procured by bribery, why didn't the SEC find that to be the fact in the Monday case? They held that this was beyond their powers, that the SEC does not go back and read and look to pass things. They do go forward. They will go forward, but they do not go back to invalidate their past rates. And the Monday case said that is where they said they didn't have jurisdiction over these type of claims. So that really the courts are the only place that and the appropriate place for someone to go under Arizona law. And in this case, didn't the SEC do something for respectively when the bribery came to light? Eventually, they are taking under consideration a new rate, and there was the the tax add-on rate was taken out eventually as well. So they were short. Did they lower the rates? No, they haven't. They haven't lowered the rates. They took out the tax passed through, I believe, in 2015. I could be off on that. And they are now reviewing the rates to be applied going forward. Indeed, the other part about this is that Johnson Utility is no longer in the utility business. It's been sold to the business, been sold and operated by EPCOR. So that if it was a rape case, EPCOR wouldn't be responsible would say we're not responsible for that. I think we have covered most all of our arguments. If I could have a second, I don't unless the court has some more questions. Do you think that the district court can determine the effect of bribery as opposed to other economic conditions as to the raise in tax rates in 2011 and 2013? In this case, yes, because without the before the bribery plan had had gone into operation. Mr. Johnson's proposal to have the rate increase was denied by the commission. And then the bribe was put into place. And Mr. Pierce, the chair, re-raised it and got it passed. So that this is one of those few cases where you read through the indictment, you read through Judge Reyes's opinion. There may be other cases where there are various concerns as to whether whatever. This is a case where the 2000 rate, 2010 rate was set. The increases that Mr. Johnson, the Johnson Utility sought were proposed and rejected. The bribe went into operation and the rates were then re-raised by Mr. Pierce and passed. The commissioner, the chairman often has great leverage or influence. The fact is, this is a case where, as Judge Reyes recognized, it's very particularized and proof. You'd say, don't believe us. The United States of America, in its indictment, identified with particularity. This is why this case is different from those in which there are sort of generalized things that say, well, they treat the regulators very nicely. They wine and dine them and so they get better treatment. This is a case where the rate was, the 2000 rate was fine. The increases were rejected. The bribe went into effect. The new rate was put in. All you have to do, don't have to worry about reasonableness. Just eliminate the bribe or you measure it by the bribe-induced increase and QED. Thank you, counsel. Thank you, your honor. Mr. Fuller, we'll give you two minutes. Mr. Fuller, can I ask you a question before you get into your two minutes? Do you agree with Mr. Crisloff that the ACC decision in Monday stated that the ACC did not have the jurisdiction to go backwards and determine whether the 2011 and 2013 rates were produced by bribery? And if so, to what extent? And re-figure whether the 2011 and 2013 rates were indeed just and reasonable. I didn't see that in the Monday opinion, your honor. And on that issue, I would point the court to the Taffet case from the Eighth Circuit that explicitly comments on this idea that, of course, a commissioner, an agency, a regulatory body could go back and look at the past effects. If there were fraud, if they found that there were fraud, had been fraud, could take that into account in what a just and reasonable rate would be going forward. They would have that power. Mr. Fuller, can I follow up to Judge Bail? So when they say, when the commission noted that it has broad constitutional and statutory power over many aspects of public service, but then they specifically say, as to the other claims, the commission deferred to the superior court, finding that the commission did not have jurisdiction to adjudicate claims based upon theories of tort and contract law. What does that mean then? That means that the plaintiffs need to pursue any claim pertaining to rates within the commission, which has absolute exclusive plenary authority to do that. Why are they deferring to the superior court? Because other claims had been asserted for what they were calling damages. It turns out when you get into court, the damages are measured by the rates, and so we find ourselves in the present situation. But it's true that one does not file a civil complaint for federal RICO or anything else with the ACC. That's not where it belongs. That belongs in the courts. Rate rescission and so forth belongs in the ACC. That's the distinction. But you can't determine damages until you determine what are just and reasonable rates in the ACC. But you're right, Your Honor, and that has been determined and was never overruled, was never reversed or anything. And on that point, I want to make sure I get this. Page 29 of the answering brief, Your Honors, plaintiffs, quote, are challenging. They say they're challenging the racketeering and bribery and, quote, not the underlying reasonableness of the rate. They are not challenging this. And so, you know, this is a distinction without a difference to say, well, we're not agreeing, but we're not challenging. For purposes of this appeal, for purposes of class certification, there is no challenge to the findings. And, again, only the ACC determines what is just and reasonable. I think you answered this, but can you just reiterate? So the ACC cannot issue damages. If the ACC found that the 2011 rates were unjust and unreasonable, what power do they have? They have the power to rescind those rates and to set different rates going forward, which could, at least theoretically, take into account the past misconduct if they were to find it. So what happens to all the customers that pay the unjust rate? How do they get their money back? Well, and that's interesting because I think then you get to the Carlin case, which the other side has emphasized. The Carlin case holds that if the agency itself finds that a prior rate was improper for some reason, excessive, for example, let's say in that case they look back and they said, here's someone who gave us misrepresented data that we then plugged into a formula, and we calculated what we now see was the incorrect rate, and we are not only going to hold that that was the incorrect rate, we are going to tell you, we're going to tell the world what the rate would have been absent the misconduct. We tell you what that is, and this court says that claim can go forward, a claim for damages, because at that point you're not interfering with, you're not second-guessing the rate-setting process. The agency itself— Mr. Fuller, that sounds like an exhaustion requirement then. Why is that not a defense? That was, I believe, decided on a motion to dismiss, Your Honor. I could look back procedurally. It's a legal issue. It's a legal issue. That theory does not work. If the theory doesn't work, it's not—it's the plaintiff's burden to proffer a theory that works. Absolutely, you're over time, unless my colleagues have any other questions. Okay, if you just want to finish your thought, go ahead, Mr. Fuller. I just want to point—my opposing colleague has tried to shrug aside all of the cases. I would just say that there are two bribery cases that are cited in the briefs, only two both go our way, the H.J. case, which this court has cited with approval, and the very recent Fifth Circuit's opinion in Alexander. Thank you, counsel. Could I have 15 seconds? Since we let Mr. Fuller go way long, go ahead. The difference between this and the cases that he cites is that Taffet is in the Eleventh Circuit dealing with, I believe, Alabama and Georgia, both of which have a very strong filed-rate doctrine, and H.J., Minnesota, had a filed-rate doctrine that apparently included general allegations, would preclude general allegations of bribery. Arizona does not. Thank you, counsel. Thank you, Your Honor. Thank you for that. Thank you. Yes, this case will be submitted. We'll turn to the next case, which is Sandra Barr v. Andrew Wheeler.
judges: Bea, Cardone, Bumatay